1

2

3

4

5

6

7

8                        IN THE UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10   UNITED STATES OF AMERICA,

11              Respondent,               No. CR. S-93-0016 LKK EFB P

12        vs.

13   DONALD F. MARUTZ,

14              Movant.                   FINDINGS & RECOMMENDATIONS

15   _____/

16        Movant, Donald F. Marutz, seeks an order vacating his conviction and sentence in this

17   case pursuant to 28 U.S.C. § 2255.[1]  On December 12, 1994, Marutz was convicted of

18   conspiracy to manufacture methamphetamine, 21 U.S.C. §§ 846, 841(a)(1), attempted

19   manufacture of methamphetamine, 21 U.S.C. § 841(a)(1), possession of a listed chemical, 21

20   U.S.C. § 841(d)(2), and failure to appear, 18 U.S.C. § 3146(a)(1).  A judge of this court

21   sentenced him to serve 360 months in prison.  Marutz appealed and the Ninth Circuit affirmed

22   the convictions, but remanded for resentencing on the ground that Marutz had been denied the

23   right of allocution.  *United States v. Marutz*, 77 F.3d 491 (9th Cir. 1996).  Marutz thereafter filed

24   this collateral challenge to his conviction and sentence claiming that his counsel was ineffective

25

26        [1] This action proceeds on the November 30, 2004, second amended motion to vacate the
     judgment and sentence.

throughout the pre-trial proceedings, trial, sentencing proceedings, and on appeal.  Marutz also claims that his sentence was enhanced beyond the statutory maximum without the factual basis for the enhancement being submitted to the jury for determination under the reasonable doubt burden of proof, in violation of his Fifth Amendment right to due process and his Sixth Amendment right to trial by jury.

**I.  Facts**

    **A.  Background**

According to the Criminal Complaint and supporting affidavit filed December 2, 1992, the Placerville, California Police Department was notified of a suspicious fire at a motel involving Marutz.  The room that caught fire contained a five gallon gas container holding an unknown liquid, a five gallon plastic can and several other five gallon containers–some of which contained a white powder substance.  This room had been rented to Donald Marutz.  The fire department personnel at the scene discovered an adult male at the room with burns on his head and hands.  The man, later determined to be Marutz, refused medical treatment and left the scene.  The motel management reported that the man had been paying for the room by check with an account at a bank in Lebanon, Oregon.  Inquiry with the Lebanon Police Department revealed that Marutz was under investigation for suspected involvement in manufacturing methamphetamine.  Officers removed from the room indicia of occupancy and samples of the contents of the containers.  Among the indicia taken was a storage locker receipt for a locker in the Placerville area.  A search warrant was obtained for the locker and the search revealed methamphetamine lab equipment, chemicals and numerous items bearing the name Donald Marutz, including his college diploma.

Following further investigation Marutz was indicted and ultimately convicted at jury trial of conspiracy to manufacture methamphetamine, 21 U.S.C. §§ 846, 841(a)(1), attempted manufacture of methamphetamine, 21 U.S.C. § 841(a)(1), possession of a listed chemical, 21 U.S.C. § 841(d)(2), and failure to appear, 18 U.S.C. § 3146(a)(1).

2

1    Although not charged jointly, the case involves three individuals:  the movant, Donald

2  Marutz, and his co-conspirators Linda Sevey and Martin Bracamonte.  Together, they

3  manufactured methamphetamine, primarily for sale.  Bracamonte faced lesser charges of

4  transportation and possession of a clandestine lab in exchange for his cooperation and testimony

5  and Sevey was given immunity in exchange for her assistance and testimony.  Reporter's

6  Transcript of Jury Trial ("RT") 641, 837.

7    At trial the government relied heavily on the lab equipment, chemicals, chemical analysis

8  and testimony about how methamphetamine is manufactured.

9    **B.  The Process of Manufacturing Methamphetamine**

10    The government presented testimony of a forensic chemist describing the process Marutz

11  and his co-conspirators used.  Initially, ephedrine, which is a precursor to methamphetamine,

12  was obtained.  When, as here, ephedrine is obtained from over-the-counter medications, a

13  solvent like methanol, i.e., methyl alcohol, is commonly used.  RT 969.  Methanol is mixed with

14  the pills and either is stirred gently or left to sit until the methanol evaporates, leaving a layer of

15  ephedrine.  RT 969.  The ephedrine is mixed with red phosphorous and hydroiodic acid and

16  heated for a period ranging from 12 up to 72 hours.  RT 968.  Thereafter, the red phosphorous is

17  filtered out of the mixture, and water and sodium hydroxide (i.e., lye) are added.  RT at 968.

18  This causes methamphetamine to separate out as an oil, at which point Freon is stirred into the

19  mixture.  RT 968.  The methamphetamine dissolves in the Freon, and these two separate out

20  from the water.  RT 968.  The Freon/methamphetamine layer is drawn off and subjected to a

21  reaction with hydrogen chloride so as to crystalize the methamphetamine and separate it from the

22  Freon.  RT 968.  The crystal methamphetamine is then "washed" in acetone in order to "remove

23  some of the impurities."  RT 968.  Sodium bisulfite is used to make the final product truly white.

24  RT 976.  Equipment used in this process includes crock pots, heating mantles, flasks, jugs,

25  buckets, large garbage bins and vacuum pumps.

26  ////

**C.  Marutz and Bracamonte Get Started**

At the time of Marutz's arrest on December 4, 1992, he had not known Bracamonte for long.  The two met in July 1992, during a blackjack game in Newport, Oregon.  RT 783.  Bracamonte testified that after the game they chatted, only to discover that they had a mutual interest in manufacturing methamphetamine.  RT 784-86.  Bracamonte described a manufacturing process that would produce a higher yield of the drug, thereby garnering a higher profit than the process Marutz had been using.  RT 786-87.  Thus, the two discussed the possibility of meeting in California, where Bracamonte lived.  RT 788.  Marutz testified that he was not involved with the manufacture of methamphetamine.  RT 1182.  He asserted that he was traveling around Oregon and California looking for a location to open a restaurant and seeking investors for that enterprise.

Marutz and Bracamonte eventually met in California.  Marutz testified that around the first of October 1992, he took his wife B.J., who for health-related reasons required ongoing care and attention, to see Lake Tahoe.  RT 1095.  While there, he called Bracamonte to discuss the restaurant business.  RT 1096.  According to Bracamonte, however, he met Marutz at Harrah's, where they discussed manufacturing methamphetamine, including details such as the ephedrine yield of pills, the market for methamphetamine and purchase prices for their product.  RT 789-792.  The two did not quite trust each other and accused each other of being undercover officers.  RT 790.  Bracamonte testified that ultimately, Marutz gave him a piece of manufacturing equipment as a token of his good faith. RT 793.  Marutz also told Bracamonte that he sometimes stayed at the Brigadoon Motel in Vacaville under the name of "Buster Page."  RT 793.

About a week after their meeting at Lake Tahoe, Marutz and Bracamonte met again in Dixon, California.  RT 793-94.  Bracamonte testified that Marutz gave him $2,000.00 worth of money orders to purchase 300,000 "stay-alert" tablets.  RT 794, 798.  Bracamonte ordered the pills using the name "Ken Sanderson."  RT 798.  The pills were delivered under that name to Marutz's home in Oregon, where Marutz successfully extracted ephedrine from a large number

4

of them.  RT 799.

Bracamonte admitted that in mid-October 1992, he ordered tablets and began extracting ephedrine from them in the Sacramento apartment where he lived.  RT 800.  However, before the extraction process was completed, state officials obtained a search warrant.  Crim. Compl., Dckt. No. 1, Attach. (11/3/92 Report of Investigation); RT 802.  On October 27, 1992, federal and state agents went to Bracamonte's apartment and executed the warrant.  RT 802.  They found an active methamphetamine laboratory in the apartment and Bracamonte was arrested.  RT 804-05. However, he was released the same day.  RT 804-05.  From Bracamonte's apartment, law enforcement officials seized chemicals and equipment used to manufacture methamphetamine. Amongst the items seized were containers with a white powder residue, containers with a moist white powder, a propane canister, large plastic garbage cans, bags containing about nine pounds of a white powder that tested positive for ephedrine, over 100 grams of different powders that tested positive for ephedrine and amphetamine, a firearm, a condenser column, other laboratory equipment, a rental car receipt, and an address book.  Crim. Compl., Attach.; RT 472-76; 973-75.

**D.  Linda Sevey Meets Marutz**

Sometime in that same month, October 1992, Sevey met Marutz and his friend Rita Heimbuch in a Vacaville tavern.  RT 564.  Marutz introduced himself to her as "Buster Page." RT 565.  Sevey and Marutz both testified that Marutz hired Sevey to drive Heimbuch to the airport the next day.  RT 567-68, 1105.  Sevey testified that she mentioned to Heimbuch that her boyfriend was in prison for manufacturing methamphetamine.  RT 565.  She also testified that Marutz and Heimbuch questioned her about her knowledge of manufacturing methamphetamine, a contention that Marutz disputes.  RT 565-66.  In that regard, Heimbuch was prepared to testify that Sevey and Marutz did not discuss Sevey's imprisoned boyfriend or the manufacture of methamphetamine, in contradiction to Severy's testimony.  RT 930-31.  However, following a hearing outside the presence of the jury regarding the scope of permissible cross examination of Heimbuch, Marutz' counsel decided not to call her.  Counsel indicated that doing so would have

1   opened the door for impeachment on the charge of failure to appear.  RT 916, 927-930.

2          Soon after meeting her, Marutz hired Sevey to care for B.J, Marutz's wife.  RT at 574.

3   Sevey and Marutz traveled to Placerville.  According to Marutz, Sevey was helping him with

4   various tasks, such as finding someone to replace a blown gasket in the motor home and

5   preparing to move household items from Marutz's house in Oregon to California.  RT 1110-

6   1124.  Marutz rented a storage locker at the Queens Storage Rental Units, located in Placerville,

7   RT 575- 583, where, he testified, he intended to store his household items from Oregon.  RT at

8   1127.  He testified that he gave Sevey a key to the locker because she was caring for his wife,

9   B.J.  RT 1127.  Sevey testified that she believed that the storage unit was for personal belongings

10  from Oregon, but denied that Marutz gave her a key.  RT 583.  While Sevey and Bracamonte

11  maintained that the equipment and chemicals in the locker belonged to Marutz, Marutz testified

12  that they were not his and he did not put them there.  RT  1170-71.  To explain the presence of

13  his fingerprints on some of the equipment, Marutz testified that he arrived at the locker one day

14  to find the equipment covered by an orange tarp.  He said that he moved the tarp out of the way

15  to access his own belongings.  RT 1171.

16         A few days after Bracamonte was released from custody, Marutz and Bracamonte

17  discussed processing their remaining 100,000 tablets in order to recover some of the losses

18  sustained as a result of law enforcement learning of Bracamonte's home laboratory.  RT at 806.

19  Thus, according to Bracamonte, on October 27, 1992, he and Marutz met in the parking lot of an

20  automotive equipment store in Sacramento.  RT at 807.  Marutz had facilities for the extraction

21  of ephedrine in his motor home, which he drove to the parking lot.  RT 807-08.  Bracamonte

22  waited in the motor home while Marutz purchased methanol.  RT 807-08.  When Marutz

23  returned, Bracamonte dumped the pills into a five-gallon container, and the two poured methanol

24  over them and sealed the containers.  RT 808-09.  Around this time, Marutz asked Sevey to go

25  to her home in Vacaville to collect a package delivered to "Jamie Gibson," and told her to

26  destroy the UPS labels.  RT 589.  While Sevey was in Vacaville on this errand, Marutz, in the

6

1  company of Bracamonte, rented three rooms at the Brigadoon Lodge, also located in Vacaville.

2  RT 593, 809-10.

3  **E.  The Brigadoon Lodge Laboratory**

4  Joyce Tuitile, the manager of the Brigadoon Lodge, testified that she knew Marutz as

5  "Buster Page," who had rented rooms at the Brigadoon Lodge on several occasions.  RT at 882.

6  Bracamonte testified that he and Marutz moved the equipment from the motor home into

7  Marutz's room, where they completed manufacturing the batch of methamphetamine they had

8  begun in the Sacramento parking lot.  RT at 593, 808-817, 819, 821.  In the kitchen, they boiled

9  off the methanol.  They took the resulting ephedrine to the bathroom and placed it under a heat

10 lamp to dry.  RT at 811-12.  Marutz unloaded from the motor home the equipment necessary for

11 the remainder of the process and set it up in the kitchen, where he mixed the ephedrine, red

12 phosphorous and hydrioidic acid.  RT 812.

13 Sevey arrived at the Brigadoon the same day as Marutz and Bracamonte and set up a lab.

14 The evening after the laboratory was established, Sevey heard a "pop" from inside Marutz's

15 room.  She described this as the sound of glass breaking and said that she noticed "a real strong

16 odor of red phosphorus."  She said that she recognized the smell from having been around it

17 before while making methamphetamine.  RT 598-99.  Sevey went down stairs to find out what

18 happened and saw the door of Marutz's room open.  She went in and saw "Don [Marutz] and

19 Martin [Bracamonte] were in hysteria trying to clean up a mess that was on the floor.  There was

20 glass, the smell of chemical.  There was red stuff on the carpet."  RT 598-99. When she asked

21 what was going on Marutz responded: "We're maufacturing methamphetamine.  What do you

22 think?"  RT 599.  Sevey went back up stairs and sometime shortly thereafter Marutz went up and

23 asked her if there was any place she could get a boiling flask because of the one that had broken

24 in the room.  She contacted a source who had a "triple neck" flask available for $200.  She said

25 that Marutz and Bracamonte discussed whether it would work and "bickered over who was

26 going to pay for it."  RT 600.  Eventually, Bracamonte gave her the $200 and she left.  *Id.*

7

1    In contrast, Marutz testified that he was not there at the time of this incident and was in

2    Placerville, instead.  RT 1155.  He testified that Bracamonte called him to say that a glue gun

3    had been dropped on the floor and burnt a hole in it.  RT 1156-57.  According to Marutz, when

4    he arrived at the Brigadoon, Bracamonte was in the bathroom and the tub was full of what

5    Bracamonte identified as ephedrine.  RT 1151.

6    Sevey testified that in addition to obtaining a new flask for Marutz she also retrieved, as

7    instructed, other replacement equipment from Marutz's Placerville storage locker, where she saw

8    bottles of freon, rubbing alcohol, and several large boxes.  RT 599, 602-04.  Sevey returned to

9    Vacaville with the equipment and helped repair the laboratory.  RT 605.  When the product was

10    finished, Bracamonte and Sevey sampled it, but Marutz did not.  RT 825.  Bracamonte verified

11    that it was methamphetamine.  *Id.*  He and Marutz cut the product with caffeine to add weight

12    and then packaged it for delivery.  RT at 826.  Then, at Marutz's direction, Sevey drove to

13    Redding, California, and delivered to a customer one pound of the methamphetamine in

14    exchange for $2,800, which Sevey gave to Marutz.  RT at 611.  Bracamonte later met Marutz at

15    Lake Tahoe, where Marutz paid him.  RT 827-28.  Meanwhile, Marutz had ordered another

16    shipment of pills to be delivered to Sevey's home in Vacaville under the name "Jamie Gibson."

17    RT 613.

18    A federal Drug Enforcement Agency ("DEA") agent testified to having found an acetone

19    can in Marutz's room at the Brigadoon Lodge.  RT 941-42.  The parties stipulated to the fact that

20    Sevey's fingerprint was on this can.  RT 1002.

21    **F.  The Hangtown Laboratory**

22    Following the broken flask incident in the Brigadoon Lodge in Vacaville, Marutz went to

23    Placerville, where he had rented two adjoining rooms at the Hangtown Motel in Placerville.  RT

24    613.  Sevey testified that, on Marutz's instructions, she collected the package of pills that had

25    been delivered to her home under the name of Jamie Gibson, purchased 15 gallons of methanol

26    at an automotive store, and met Marutz at the Hangtown Motel.  RT 613.  When she arrived

8

there on November 20, 1992, Marutz gave her a key to the room next to the one he had been
staying in.  RT 616.  Sevey put the pills and methanol in that room.  Marutz arrived sometime
thereafter, bringing with him equipment from the motor home, including a kitchen garbage can,
buckets and more methanol, and together they opened the pills.  RT 614.  They cut the bottoms
off the pill bottles with a knife, and Sevey, again on Marutz's order, went to purchase more
methanol.  RT 615.  She returned to find Marutz was stirring pills and methanol in buckets in the
motel room kitchen.  RT 615.  Marutz left the room for about half an hour, and Sevey stirred the
mixtures in the buckets.  RT 615-16.  When Marutz returned, Sevey left to get pizza.  RT 616.
When she returned about twenty minutes later, the room in which they had been stirring the
chemical mixtures was on fire.  RT  616.  Marutz's face and hands were singed, and he said
something about having lit a candle.  RT 616.  Bracamonte explained that when fumes from
burned methanol make contact with oxygen, the combination is explosive.  RT 829.

     After extinguishing the fire, which took about 15 minutes, police and firefighters entered
and began removing things from the room to ensure the fire would not reignite.  RT at 538.
Police found five-gallon metal gas containers.  RT 544.  Firefighters found the buckets
containing the methanol mixture, but did not know what it was.  RT 540.  They called a
hazardous materials team, which could determine only that the contents of some containers had a
high Ph balance and the contents of others had a low Ph balance.  RT at 540; RT of August 30,
1993 Proceedings, at 44.  The government's lab results showed that the chemical composition of
the substances was consistent with flour or starch.  ER 22.

     A fire captain found a small hole above the toilet leading to the adjoining room, which
Marutz also had rented.  RT 538-40.  He showed Detective Lindholm of the Sparks Police
Department.  RT 539-40, 544.  Lindholm entered this adjoining room to search for chemicals
and while doing so saw a storage locker rental receipt on a night stand.  RT 545.  This receipt
was later the focus of a suppression motion.  At an evidentiary hearing on Marutz's motion to
suppress the evidence seized from the storage locker, Lindholm testified that the documents on

the night stand were "fanned out" and that he did not move, lift, or touch anything to see the receipt.[2]  RT of August 30, 1993 Proceedings, at 46, 62-63.  Lindholm asserted that he seized the receipt, along with other papers, because they contained the name of the occupant of the room.  *Id.* at 46, 56, 63.  Lindholm later testified that he gave the storage receipt to his superior officer because he knew from experience that methamphetamine manufacturers often rent units to store chemicals and equipment.  *Id.* at 56.

When Marutz determined that they had to leave the scene of the fire he told Sevey to take B.J. in the Porsche and to meet him down the road.  RT 617.  Sevey did as she was told, and parked in front of a laundrymat a short distance from the Hangtown Motel.  RT 617.  Marutz met them about 15 minutes later and gave Sevey money to pay for rooms at a different motel.  RT 618.  At Sevey's suggestion, they agreed to rent rooms at a Super 8 in Cameron Park.  RT 618.  Driving the Porsche, Sevey left for the hotel without B.J. and Marutz, who arrived while Sevey was registering for their rooms.  RT 618.

Apparently on the night of the fire, i.e., November 20, 1992, Sevey called Bracamonte to explain what happened.  RT 829.  Bracamonte and Marutz got together about two or three days later, and Marutz asked Bracamonte to help retrieve equipment from the storage locker.  RT 831.  Marutz also requested financial assistance, and Bracamonte gave him $300.00 to cover some of the losses from the fire.  RT 830.  Two or three days later Marutz called Bracamonte from Reno, Nevada and said that he needed to start the extraction process again because he had a deadline to meet.  *Id.*  Marutz asked Bracamonte to retrieve equipment from the Queens Storage Locker in Placerville and meet him in Reno.  *Id.*  Marutz left for Nevada, telling Sevey that another package of pills would be arriving at her home in Vacaville, and that she should collect them and then meet him at Lake Tahoe.  RT 619.

////

----

[2]  Marutz disputed this and claimed that the receipt was in a closed, black bag behind a chair, a claim Lindholm disputed.  RT of August 30, 1993 Proceedings, at 57.

1    **G.  The Search of Bracamonte's Truck**

2    On November 25, 1992, while Marutz and Sevey were preparing to manufacture

3    methamphetamine in Nevada, Bracamonte went to the Queens Storage Locker and loaded

4    equipment from Marutz's unit into his pick-up truck.  RT 834.  As he finished loading, he

5    noticed two sheriff's department cars on the premises about 50 yards away from him.  RT 127.

6    Bracamonte saw one deputy go to the business office.  RT 128.  Bracamonte assumed that the

7    deputies were there for him, but since they did not stop him, he left.  RT 128.  Shortly after

8    leaving the storage unit, a deputy sheriff (who had not been at the storage facility) stopped

9    Bracamonte based on a traffic violation.  Crim. Compl., Attach.; RT 127-28.  During the stop,

10   Bracamonte told officers that he was moving personal belongings from a storage locker in

11   Placerville to Lake Tahoe as a favor to someone named "Jamie."  Crim. Compl., Attach.; RT

12   131-32.  One of the officers discovered that there was an outstanding misdemeanor arrest

13   warrant for Bracamonte, and arrested him.  *Id.;* RT 505, 834-35.  Based on this arrest, officers

14   had Bracamonte's truck impounded and they conducted an inventory search.  Crim. Compl.,

15   Attach.

16   During the search, officers found beakers, vacuum flasks, hydrioic acid, heating mantles,

17   filters, funnels, flasks, red powder, alcohol wash, large plastic garbage cans, laboratory

18   equipment, a .22 caliber semi-automatic pistol with a magazine and seven rounds, a sawed-off

19   shotgun loaded with two 20 gauge rounds, six 20 gauge rounds in a box, and a book explaining

20   how to create a foolproof new identity.  *Id.*  Samples from various pieces of equipment tested

21   positive for methamphetamine or ephedrine, or for chemicals used in the manufacturing process.

22   RT 945, 975-979.  They also found a postcard from the Brigadoon Lodge signed, "Buster."  RT

23   507-23.  Marutz's fingerprints were found on two flasks, three beakers and an amber colored jug

24   seized from Bracamonte's truck. RT 1001-02.

25   Marutz and Sevey did not immediately learn of Bracamonte's arrest.  Thus, according to

26   Sevey, Marutz continued to direct Sevey in their enterprise.  Sevey went to Vacaville to collect

1   pills that Marutz had said would be delivered to her house.  RT 619.  But the package had not

2   arrived.  *Id.*  Sevey therefore decided to meet Marutz at Lake Tahoe.  RT 619-20.  When they

3   met, Marutz told Sevey that the pills would arrive at her house within a few days.  RT 620.

4   Thus, Sevey returned to Vacaville, collected the pills and returned to Nevada, where she again

5   met Marutz, this time in Minden.  RT 620-21.  It was when Marutz and Sevey began processing

6   the pills in a room at the Carson Valley Inn in Minden, Nevada, that they learned of

7   Bracamonte's arrest.  RT 622.  Apparently fearing that police would learn of Martuz's activities

8   either from the items in Bracamonte's truck or from Bracamonte himself, Marutz panicked.  RT

9   622.  To avoid detection and arrest, Sevey and Marutz drove to Reno, where they rented rooms

10  at the Western Village Inn.  RT 623, 625.

11          **H.  The Search of the Storage Locker**

12          Based primarily on the receipt Lindholm seized from the Hangtown Motel, federal agents

13  obtained a warrant to search Marutz's storage locker.  Crim. Compl., Attach.  On December 2,

14  1992, police searched the locker and seized flasks, rubber gloves, a heating mantle, six cans of

15  acetone, cans of sodium hydroxide, a 100-pound container of Freon and about 10 pounds of a red

16  powder, photographs, and a college diploma in the name of Donald Frederick Marutz.  Crim.

17  Compl., Aff. in Support.  They also seized documents bearing Marutz's name, a photograph of

18  Marutz, a box of lye containing an Oregon shipping address, a cloth testing positive for D-

19  methamphetamine and a precursor substance, several glass flasks and boiling stones testing

20  positive for D-methamphetamine, and a plastic fitting with yellow stained residue testing

21  positive for D-methamphetamine.  RT 937-40, 945, 952-54.  The government introduced the

22  drug-related evidence (i.e., the chemicals, containers and results of chemical analyses of residues

23  on the equipment) at trial.  RT 945, 979-981.  It also relied on the documents and photograph.

24  RT 938-39.

25  ////

26  ////

**I.  The Western Village Inn Laboratory**

After the fire at the Hangtown Motel, Marutz, his wife B.J. and Sevey moved to and stayed at several different motels.  As noted, Sevey brought the pills she had collected from Vacaville to the Carson Valley Inn, in Nevada, where she and Marutz began the process of extracting ephedrine from pills, RT 620, and it was while staying at the Carson Inn that Marutz and Sevey learned of Bracamonte's December 2, 1992, arrest.  RT 622.  They could not complete the batch of methamphetamine they had begun without the laboratory equipment.  RT 623.  However, they again feared detection.  Therefore, they put the barrels and jugs of chemicals and mixtures from their rooms at the Carson Inn into Marutz's motor home.  Two days later they rented three rooms in the Western Village Inn in Nevada, where they continued the extraction process.  RT 624-25, 628.  Marutz stated that he feared law enforcement officers were tracking the licence plate numbers for his Porsche and motor home.  Thus, at his direction, Sevey stole different license plates for both vehicles.  RT 628.  She stole only one for the Porsche and placed it on the rear of the car, leaving the front without a plate.

Not surprisingly, on the morning of December 4, 1992, a Sparks Police Department officer noticed that the Porsche had no front license plate.  RT 429.  Suspicious, he checked the number on the rear plate, and discovered that the plate was stolen.  RT 429.  Unable to locate the owner of the Porsche, the police towed it.  RT 432.  Within a day or two of placing the stolen license plate on the Porsche, Sevey noticed that the Porsche was missing.  She inquired about it at the front desk and a security officer told her that a Porsche had been towed.  RT 630.  At this point, Marutz and Sevey moved the motor home and parked it at a different location.  When they returned to the Western Village in a different vehicle, they saw that several police vehicles were present.  Because of the presence of the police cars Marutz took Sevey to a nearby restaurant and left her there to wait.  *Id.*

Officers of the Sparks Police Department learned by tracking the vehicle identification number that the Porsche was registered to Marutz.  RT 429.  Thus, they consulted with hotel

security staff about the suspicious Porsche, and Detective Michael Cardella of the Sparks Police Department was assigned to conduct surveillance of the rooms Marutz was using.  RT 431-32. After receiving information about hazardous materials from Detective Depoale, Cardella searched the rooms for anything that might pose a health hazard.  RT 433.  From two of the rooms at the Western Village Inn, law enforcement officers seized a heating plate, a jug and crock pot with a white powdery residue, and samples of a white powdery residue found in various locations within the rooms.  RT 501-502.  The jug, heating mantle and crock pot are items used in the manufacture of methamphetamine.  RT 501-502.  The white powder tested positive for ephedrine.  RT 954-958.

Federal agents found Marutz leaving the hotel's casino and approached and questioned him.  RT 443-444.  Captain Robert Cowman of the Sparks Police Department interrogated him and Captain Cowman testified that Marutz confessed to there being about 15 pounds of ephedrine in the motor home, explaining that he was transporting the ephedrine to a friend so that it could be used in the manufacture of methamphetamine.  RT 759-60.  When Captain Cowman expressed safety concerns about chemicals Marutz assured him that the motor home was well-ventilated.  RT at 759.  During this discussion, Marutz consented to federal agents searching the motor home.[3]  RT 763-64; ER 74-76.  DEA Special Agent Croslin searched the motor home and found dark-colored plastic bags containing a approximately 30 pounds of a white powdery substance that he suspected to be ephedrine.  RT 461-62.  He also found electric heating elements, a crock pot, spatulas, knives, a small shovel, a small wood bowl and small pots and pans with white powder on them.[4]  RT 462.  He also found two 15-gallon buckets full of a

---

[3]  Marutz claims that DEA agents had been abusive towards him and his wife at the time of his arrest in order to obtain his consent for the search.  He submits an unsigned document that he styled "affidavit," in which he describes the events that he claims to have constituted coercion.  ER 178-184.

[4]  As noted above, these items all were the sorts of things that would be used in the process of extracting ephedrine from pills.  RT 463.

1    methanol-white powder solution.  RT 463-64.  There were two five-gallon cans labeled

2    "methanol," and an unloaded .32 caliber Derringer gun.  RT 461-72.

3          Meanwhile, other federal agents approached and questioned Sevey at the restaurant

4    where Marutz had left her.  RT  637.  She admitted to knowing and working with Marutz to

5    extract ephedrine for sale.  RT 637-39.  She also admitted at trial that she had used either

6    methamphetamine or cocaine every day during her association with Marutz and that her memory

7    could have been faulty because of the drug use.  RT 646, 650.

8          **J.  Marutz's Initial Appearances in Court**

9          Marutz appeared before a Magistrate Judge of the United States District Court for the

10   District of Nevada on December 4, 1992, on charges of conspiracy to manufacture

11   methamphetamine, attempted manufacture of methamphetamine, and possession of a listed

12   chemical.  *See* 21 U.S.C. §§ 846, 841(a)(1), 841(d)(2).  At that initial appearance, the magistrate

13   judge noted that DEA agents delayed about six hours after arresting Marutz before bringing him

14   before the federal court.  Hearing Transcript, 12-4-92, at 7-9.  She admonished the agents

15   regarding the delay, but did not make any finding of specific misconduct.  *Id.*  Nor did she

16   specifically find that any of Marutz's rights had been violated.  At the detention hearing three

17   days later, Marutz's counsel alleged that DEA agents had abused Marutz and his wife, but no

18   evidence was presented in support of these accusations.  Excerpt of Record, filed June 29, 1999,

19   ("ER") 167.  Marutz apparently mentioned these allegations to his attorney, as evidenced by a

20   memorandum of an assistant federal public defender speculating that the alleged abuse was the

21   reason that Marutz initially was released pending trial.  ER 17.

22         **K.  The Motion to Suppress Evidence**

23         Marutz's counsel filed a motion to suppress evidence, but Marutz failed to appear for the

24   hearing on the motion.  Def.'s Mot. to Supp., filed February 17, 1993; Hearing Minutes, Dckt.

25   No. 18.  A bench warrant was issued and the government filed a superseding indictment, adding

26   ////

1   a count for failure to appear.[5]  Hearing Minutes, Dckt. No. 18; Superseding Indictment, Dckt.

2   No. 28.

3          The suppression motion sought to suppress the evidence seized from the storage locker.

4   Counsel argued that this evidence was the fruit of an illegal, warrantless search of the

5   defendant's rooms at the Hangtown Motel in Placerville.[6]  The court found that the need to

6   ensure the rooms were free of hazardous materials, the knowledge that Marutz had rented both

7   rooms, and the presence of a hole in the wall between the two rooms presented exigent

8   circumstances justifying the warrantless entry.  RT of September 20, 1993 Proceedings, at 6.

9   The court further found that the receipt was in plain view and that Lindholm had understood its

10  potential significance.  *Id.* at 8-9.   As discussed below, Marutz argues that his counsel had

11  reason to believe that the receipt was not in plain view and should have made this argument

12  before the trial court.

13         Although counsel successfully moved to suppress Marutz's statements to Special Agent

14  Smith of the DEA, he did not move to suppress Marutz's statement to Captain Cowman.  *Id.* at

15  9-10.  Thus, the statements to Smith were excluded and the statements to Cowman were admitted

16  into evidence.

17  **L.  The Destruction of Sevey's Statement to Police**

18         Counsel moved to dismiss the indictment on the ground that the government had

19  destroyed the statement that Sevey had given to officers of the Sparks Police Department.  RT of

20  November 8, 1993 Proceedings, at 12.  Officials of that department turned the taped statement

21

22         [5]  The superceding indictment charged Marutz with four separate counts as follows:
    Count 1, Conspiracy to Manufacture Methamphetamine in Violation of 21 U.S.C. §§ 846,
23  841(a)(1); Count 2, Attempted manufacture of Methamphetamine in Violation of 21 U.S.C. §
    841(a)(1); Count 3, Possession of a Listed Chemical in Violation of 21 U.S.C. § 841(d)(2); and
24  Count 4, Failure to Appear in Violation of 18 U.S.C. § 3146.

25         [6]  In the course of entertaining the motion, the trial judge noted that whether police would
    inevitably have discovered the storage locker without the seized receipt was a matter of
26  speculation.  RT 133.  Therefore, the trial judge did not address the argument.

over to the Drug Enforcement Agency, which destroyed it while attempting to transcribe it. *Id*.; ER at 59. Marutz conceded before the trial court that Sevey's statement exculpated herself and inculpated him. RT of November 8, 1993 Proceedings, at 9; ER at 59. With the present motion, Marutz has submitted a supplemental report made by Detective Depoale of the Sparks Police Department, who originally obtained Sevey's statement. ER at 69. In it, Detective Depoale described what he recalled of the interview, which was not much. He stated that Sevey simultaneously denied awareness of any wrongdoing on the part of Marutz and admitted to knowing that Marutz was engaged in the manufacture of methamphetamine. ER at 96. Marutz has not submitted declarations or other evidence suggesting that Sevey's statement would have tended to exculpate him. Other than the fact that the destruction occurred during an attempt to transcribe it, there is no other evidence of the circumstances of the destruction.

### M.  The Destruction of Bracamonte's Statement to Police

Counsel also filed a written motion to dismiss on the ground that the government had destroyed recordings of radio communications amongst deputies of the El Dorado County Sheriff's department concerning their surveillance of the area around Marutz's storage locker. ER at 59. Counsel did not allege before the trial court what information the transmissions contained. The court denied the motion on the ground that Marutz had not demonstrated either bad faith or a likelihood that the recordings contained exculpatory evidence. RT of November 8, 1993 Proceedings, at 8. With the instant motion, Marutz has submitted no evidence of the contents of those transmissions.

### N.  Jury Deliberations and Verdict

The jury was instructed that in order to find Marutz guilty of possession of a controlled substance, they had to find that he "possessed the ephedrine in the County of El Dorado, in the State and Eastern District of California, whether or not he possessed that ephedrine in the State of Nevada." RT 1383. While deliberating, the jury asked for a "further explanation" of this instruction, especially with respect to "location of possession of ephedrine." RT 1399, 1400.

After discussing the matter with counsel for both Marutz and the government, the trial judge instructed the jury as follows:

> To find the Defendant guilty of Count Three, you must find that the Defendant possessed the ephedrine while in El Dorado County and that while in El Dorado County he had reasonable cause to believe that it would be used to manufacture methamphetamine.  However, it is immaterial where the actual manufacturing of methamphetamine was to take place.

RT 1406.

On November 30, 1994, the jury found Marutz guilty of conspiracy to manufacture methamphetamine, attempted manufacture of methamphetamine, possession of a listed chemical, and failure to appear.[7]  RT 1438.

**O.  Sentencing**

The trial judge held a sentencing hearing and determined the quantity of methamphetamine involved.  *See* 21 U.S.C. § 841(b) (setting penalties based on the amount and type of controlled substance involved in a violation of 21 U.S.C. § 841(a)).  The government presented testimony of a forensic chemist and an agent of the DEA to explain the calculations involved in determining the amount of controlled substances involved.  RT 1455-1465, 1480-1493.  Defense counsel cross-examined these witnesses in some detail.  RT 1466-1479, 1494-1498.  Based on this testimony, the trial judge found that the government proved that there was more than one kilogram of methamphetamine involved, but less than three.  RT 1553.  This quantity, in combination with other factors such as Marutz's leadership role, led the trial judge to impose a sentence of 360 months in prison based on his calculated total offense level of 42, including enhancements.  Judgment and Commitment, filed December 12, 1994.

**P.  Appeal and Resentencing**

Marutz, through counsel, appealed.  He argued that the warrantless search of the room at the Hangtown Motel violated the Fourth Amendment.  Counsel also argued that Marutz was

---

[7]  *See* 21 U.S.C. §§ 846, 841(a)(1), 841(d)(2), 18 U.S.C. § 3146.

1    denied the right to argue that he was not a leader in the conspiracy.  Sec. Am. Mot. to Vacate,

2    filed November 30, 2004, Appx. A, at 32.  The Ninth Circuit affirmed the conviction, holding

3    that the warrantless entry was justified by exigent circumstances, and that the receipt was in

4    plain view.  Ninth Circuit Opinion, filed January 5, 1996, at 1-2.  However, the court vacated

5    Marutz's sentence and remanded "solely to allow Martuz to exercise his right of allocution."  *Id.*

6    at 5.  At the April 4, 1996, resentencing hearing, Marutz testified about why the court should

7    impose a lesser sentence than initially had been imposed.  Reporter's Transcript of Sentencing

8    Proceedings, ("Re-sentencing RT"), at 31.  Several times during this hearing, the trial judge

9    mentioned Martuz's right to seek a downward departure.  *Id.* at 3, 5, 10.  The court expressly

10   declined to limit Marutz's arguments to the circumstances he had argued on appeal.  *Id.* at 10.

11   Thus, Marutz argued that he did not have a leadership role in the conspiracy, that he was not in

12   possession of the firearm found in his motor home, the amount of ephedrine he was determined

13   to have possessed was excessive.  *Id.* at 11-21.  He also argued that he was a first-time offender

14   and his wife was dependent upon him because of her disability.  *Id.* at 22.  However, the court

15   again imposed a sentence of 360 months in prison.  *Id.* at 30-31.  Marutz again appealed April

16   12, 1996.  The Ninth Circuit affirmed on March 10, 1998.

17   **II.  Analysis**

18        This court is authorized to entertain a post conviction challenge to a judgment of

19   conviction and sentence rendered by this court.  28 U.S.C. § 2255(a).  On review,

20           [i]f the court finds that the judgment was rendered without
             jurisdiction, or that the sentence imposed was not authorized by
21           law or otherwise open to collateral attack, or that there has been
             such a denial or infringement of the constitutional rights of the
22           prisoner as to render the judgment vulnerable to collateral attack,
             the court shall vacate and set the judgment aside and shall
23           discharge the prisoner or repentance him or grant a new trial or
             correct the sentence as may appear appropriate.
24

25   28 U.S.C. § 2255(b).  As noted above, Marutz challenges his conviction and sentence on the

26   grounds that trial and appellate counsel were ineffective, and his sentence violates the Sixth

1    Amendment right to a jury trial.

2         **A.   Ineffective Assistance of Counsel (Pretrial)**

3         Marutz claims that trial and appellate counsel rendered ineffective assistance.

4    Respondent argues that Marutz cannot satisfy the standards required to obtain relief on this

5    ground.  The United States Constitution guarantees that criminal defendants "shall enjoy the

6    right to have the assistance of counsel for [their] defense."  U.S. CONST. amend. VI.  This right

7    exists to protect the fundamental right to a fair trial.  *Powell v. Alabama*, 287 U.S. 45, 68-69

8    (1932).  An accused, therefore, is entitled not just to the assistance of counsel, but to the

9    effective assistance of counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  To

10   establish that counsel's representation failed to satisfy the Sixth Amendment, Marutz must show

11   that counsel's performance fell below an objective standard of reasonableness and that he was

12   prejudiced thereby.  *Strickland*, 466 U.S. at 690.  In order to prove deficient performance,

13   Marutz must identify particular acts or omissions on the part of counsel which cannot be said to

14   have been the result of reasonable professional judgment.  *Id.*  With respect to prejudice,

15            [a]n error by counsel, even if professionally unreasonable, does not warrant
             setting aside the judgment of a criminal proceeding if the error had no effect on
16           the judgment.  The purpose of the Sixth Amendment guarantee of counsel is to
             ensure that a defendant has the assistance necessary to justify reliance on the
17           outcome of the proceeding.  Accordingly any deficiencies in counsel's
             performance must be prejudicial to the defense in order to constitute ineffective
18           assistance under the Constitution.

19   *Id.* at 691-092.  Thus, Marutz has the burden of demonstrating prejudice, i.e., a reasonable

20   probability that but for counsel's errors, the outcome of the trial would have been different.  *Id.*

21   at 693-94.  The United States Supreme Court has cautioned that, "[t]he object of an

22   ineffectiveness claim is not to grade counsel's performance."  *Id.* at 697.  Therefore, "[i]f it is

23   easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which

24   [] will often be so, that course should be followed."  *Id.*  With these standards in mind, the court

25   turns to Marutz's claims.

26   ////

                                               20

1    Marutz alleges nine instances of ineffective assistance.  For the reasons stated, the court

2    must deny relief on each of these claims.

3           **1.  Inadequate Challenge to Admission of Evidence from the Storage
              Locker**

4

5    Marutz claims that counsel was ineffective with respect to the motion to suppress the

6    evidence obtained from Marutz's storage locker.  Sec. Am. Mot. to Vacate, at 6-7; Traverse[8], at

7    4-5.  While it is not clear from the Section 2255 motion, it appears that Marutz challenges the

8    outcome of the trial on the charges of conspiracy to manufacture methamphetamine and attempt

9    to manufacture methamphetamine.  He asserts that the evidence seized from the storage locker

10   was the fruit of Lindholm's illegally having seized the receipt at the Hangtown Motel.  As noted

11   above, the district judge found that the warrantless entry into the motel room was justified by

12   exigent circumstances; i.e., a fire, the presence of hazardous chemicals, and the hole in the wall

13   between the room with the fire and the adjoining room--both of which had been rented by

14   Marutz.  The judge also found, based on the testimony of Detective Lindholm, that the receipt

15   was in plain view.  The appellate court agreed.

16          Marutz now argues that counsel's performance was deficient in three respects.  He asserts

17   that counsel should have introduced at the suppression hearing photographs and a video showing

18   that there was insufficient space on the table where Lindholm found the receipt for papers to

19   have been "fanned out" as he described.  Sec. Am. § 2255 Mot., at 7.  Marutz also asserts that his

20   trial counsel should have impeached Lindholm's inconsistent explanations of how the documents

21   were positioned on the table, and should have argued that the incriminating nature of the receipt

22   was not immediately apparent.  *Id.* at 7-8.  Finally, Marutz claims, his counsel should have

23   argued that Lindholm made false statements in the affidavit submitted to obtain the warrant.  *Id.*

24

25          [8]  The record contains two traverses, one of which was filed by Marutz himself.  Dckt.
     No. 171.  The other was filed by counsel.  Dckt. No. 185.  Since Marutz was represented by
26   counsel when he filed the traverse at docket number 171, the court disregards it. The court relies
     only on the traverse counsel filed.

1    at 8.  Marutz argues that if counsel had done just one of these things, the trial judge would have

2    found that the evidence from the storage locker was the fruit of the poisonous tree and granted

3    the motion to suppress.  Had this evidence been suppressed, he argues, there is a reasonable

4    probability that the outcome of the trial would have been different with respect to the charge of

5    attempt to manufacture methamphetamine.  As discussed below, each of these arguments is

6    without merit.

7            To prevail on a claim that counsel was ineffective for failure to file a motion to suppress,

8    a movant must demonstrate that the failure to file the motion was deficient performance and that

9    it had a prejudicial effect on the outcome of the trial.  *Kimmelman v. Morrison*, 477 U.S. 365,

10   375 (1986).  Thus, the movant must demonstrate that the motion he believes counsel should have

11   filed would have been meritorious.  *Kimmelman*, 477 U.S. at 375; *Ortiz-Sandoval v. Clarke*, 323

12   F.3d 1165, 1170 (9th Cir. 2003).  Such a showing, however, demonstrates only deficient

13   performance.  *Kimmelman*, 477 U.S., at 384;  *Moore v. Czerniak*, 534 F.3d 1128, 1138 (9th Cir.

14   2008).  The movant must also demonstrate *Strickland* prejudice, i.e., that if the evidence had

15   been suppressed, there is a reasonable probability that the outcome of the case would have been

16   different.  *Kimmelman*, 477 U.S. at 375; *see also Moore*, 534 F.3d at 1144.

17           Here, it is not necessary to determine whether counsel's performance was deficient.

18   Marutz has failed to demonstrate prejudice under *Strickland*.  A claim that counsel was

19   ineffective is not an exercise in grading counsel's performance.  Rather, it is an inquiry into the

20   reliability of the outcome of the trial under the standards set out in *Strickland*.  Marutz has failed

21   to demonstrate prejudice under *Strickland* and *Kimmelman*.  Thus, Marutz's claim can be

22   resolved without any finding about whether counsel's performance was deficient, and the court

23   need not perform the first part of the *Kimmelman* analysis.

24           **2.  Conspiracy Charge**

25           The starting point of the analysis must be with the elements of the offenses the

26   government had to prove.  For the jury to find Marutz guilty of conspiracy to manufacture

methamphetamine, the government had to prove the following: (1) an agreement to accomplish the proscribed objective; (2) the commission of one or more overt acts in furtherance of that purpose, and (3) the mental state necessary to commit the underlying offense. *United States v. Litteral*, 910 F.2d 547, 550 (9th Cir. 1990). "Knowledge of the objective of the conspiracy is an essential element of any conspiracy conviction." *United States v. Moreland*, 509 F.3d 1201, 1217 (9th Cir. 2007); *United States v. Krasovich*, 819 F.2d 253, 255 (9th Cir. 1987). "[T]he existence of an agreement may be inferred from circumstantial evidence." *Moreland*, 509 F.3d at 1217. Thus, an agreement may be shown by evidence of coordinated activity between the defendant and alleged co-conspirators. *United States v. Mesa-Farias*, 53 F.3d 258, 260 (9th Cir. 1995). Although the agreement here was to manufacture methamphetamine, itself an offense in violation 21 U.S.C. § 841(a) (1), the jury was not required to find that Marutz himself actually handled the methamphetamine to convict him of conspiracy. *Duran v. United States,* 413 F.2d 596, 602 (9th Cir. 1969).

Here, it is significant that Marutz does not argue with any specificity which element or elements of conspiracy a jury would have found lacking if the evidence from the storage locker had been suppressed.[9]  The court is mindful that, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693. The question is whether there is a reasonable probability that the jury would have found Marutz not guilty of conspiracy in the absence of evidence from the storage locker.

The government introduced from the storage locker evidence of the makings of a methamphetamine laboratory. This evidence consisted of flasks, cans of acetone, cans of sodium hydroxide, a 100-pound can of freon and about 10 pounds of a red powder, and the results of chemical analysis of residues on the equipment. A government expert testified that equipment

---

[9]  At trial, Marutz defended on the ground that the government could not prove that he participated in any conspiracy. He asserted that he wanted to start a restaurant in California, and he viewed Bracamonte as a potential investor. He also asserted that he employed Sevey to care for his disabled wife, B.J.

and chemicals of the sort introduced at trial were consistent with the manufacture of

methamphetamine.  The government also introduced from the storage locker a photograph of

Marutz and a college degree bearing his name, thereby showing that he stored his own

belongings there.  Together, this evidence surely connected Marutz to the manufacture of

methamphetamine.  Yet, there was compelling evidence against Marutz without the items seized

from the locker.  Indeed, there was evidence of various stages of the manufacturing process in so

many different locations to which Marutz had a connection that the government did not need the

evidence from the storage locker to convict.  Bracamonte testified that he met Marutz in a

Newport, Oregon bar in July of 1992, where they wasted no time in commencing a discussion

about various processes for manufacturing methamphetamine.  They met in California, where

they discussed everything from the ephedrine yields of various non-prescription medications to

the market for and possible purchase prices for methamphetamine.  To seal the agreement,

Marutz gave Bracamonte a piece of manufacturing equipment.  This evidence was sufficient for

the jury to find that Marutz and Bracamonte had an agreement to manufacture an illegal

substance even in the absence of the evidence seized from the locker.

Moreover, there was no lack of evidence based upon which the jury could find that

Marutz took some act in furtherance of the agreement.  Here, Marutz gave Bracamonte

$2,000.00 to order "Stay-Alert" pills as a source of ephedrine.  Bracamonte ordered the pills.

Within days of Bracamonte's arrest resulting from the search of his apartment, Bracamonte and

Marutz met in the parking lot of an automotive store in Sacramento, where Marutz purchased

methanol and the two began to extract ephedrine from pills.  With respect to the Brigadoon

Lodge, Marutz asserted that he could not be connected to the rooms rented by "Buster Page"

because he used his own name.  But the manager, Joyce Tuitile, identified Marutz as the person

who rented the rooms under the name of "Buster Page."  Sevey testified that she knew Marutz by

the name of "Buster Page" for weeks before learning his real name.  Regardless of whether the

jury concluded that Marutz rented the rooms under his own name or a false one, the government

had ample evidence of his involvement.  Bracamonte described in detail how Marutz removed chemicals and equipment from the motor home and placed them in a room in the Brigadoon Lodge in order to complete the process they had begun in the motor home.  He also testified that Marutz mixed the ephedrine, red phosphorous and hydrioic acid in the kitchenette.  Finally, the government introduced evidence of ephedrine and equipment found in the motor home, which Marutz conceded belonged to him.[10]

In addition to Bracamonte's testimony about Marutz's participation at the Brigadoon, the government introduced a host of items consistent with the manufacture of methamphetamine that were seized from Bracamonte's truck.  Amongst those items were beakers, vacuum flasks, hydriodic acid, heating mantles, filters, funnels, alcohol wash and large plastic garbage cans.  Some of these items had methamphetamine or ephedrine residue on them, and Marutz's fingerprints were on two flasks, three beakers and a jug.  This evidence was sufficient for the jury to find that Marutz and Bracamonte were not working together to establish a restaurant.  Rather, as the jury concluded, this evidence plainly shows they were working together to manufacture methamphetamine.

Apart from the compelling evidence that Bracamonte and Marutz were engaged in a conspiracy, the government also presented evidence that Marutz conspired with Sevey to manufacture methamphetamine.  There was evidence that following the small explosion at the Brigadoon, Marutz requested Sevey to retrieve a flask and a heating mantle from the storage locker, and she did.  This solidified the connection between Marutz and the contents of the locker.  However, the fact that evidence was found in the location Sevey identified as a source of the replacement equipment was not essential to prove the conspiracy.  Sevey's testimony about how she met Marutz and that she helped to collect replacement equipment after the explosion,

---

[10]  Marutz challenges the government's reliance on evidence from the motor home.  As will be explained, Marutz is not entitled to relief on that claim.  Thus, the evidence from the motor home may be relied upon in analysis of the other claims.

1    helped to complete producing that batch of methamphetamine and then for the next two months

2    followed Marutz's orders to collect ingredients and equipment for laboratories at various

3    locations was convincing evidence of a conspiracy.  Moreover, she described in detail what

4    Marutz did to manufacture methamphetamine at the Hangtown Motel.

5         It is clear from this record that, even in the absence of the evidence seized from the

6    locker, the jury had more than adequate evidence to convict Marutz on the conspiracy count.  In

7    short, any evidence from the storage locker was cumulative.  Marutz has not demonstrated that,

8    in the absence of evidence from the locker, there is a reasonable probability that the outcome of

9    the trial on the conspiracy charge would have been different.  This claim fails.

10        **3.  <u>Attempt Charge</u>**

11        Turning to the charge of attempted manufacture of methamphetamine, the outcome is no

12   different.  The government charged this count with respect to the November 20, 1992, incident at

13   the Hangtown Motel.  Dckt. No. 28; RT at 1269.  Again, Marutz's defense was that he was not

14   involved in the manufacturing activities.

15        In a prosecution for the attempt to commit a particular offense, the attempt itself is the

16   crime.  *United States v. Garcia*, 400 F.3d 816, 819 (9th Cir. 2005) (distinguishing aiding and

17   abetting from attempt).  Thus, the defendant must act with the purpose of committing a

18   substantive offense even though specific intent may not be required for the substantive offense.

19   *Id.*  "A conviction for attempt requires proof of both culpable intent and conduct constituting a

20   substantial step toward commission of the crime that is in pursuit of that intent."  *United States v.*

21   *Smith*, 962 F.2d 923, 928 (9th Cir. 1992).  Proof of "mere preparation" is insufficient. *United*

22   *States v. Taylor*, 716 F.2d 701, 712 (9th Cir. 1983).  There must be an overt act that is "strongly

23   corroborative of the firmness of a defendant's criminal intent."  *United States v. Buffington*, 815

24   F.2d 1292, 1301 (9th Cir. 1987).  The defendant must have engaged in some "appreciable

25   fragment" of the underlying crime.  *United States v. Hernandez-Franco*, 189 F.3d 1151, 1156

26   (9th Cir. 1999).  In other words, a defendant's "actions must cross the line between preparation

1    and attempt by unequivocally demonstrating that the crime will take place unless interrupted by

2    independent circumstances." *United States v. Goetzke*, 494 F.3d 1231, 1237 (9th Cir. 2007);

3    *United States v. Nelson*, 66 F.3d 1036, 1042 (9th Cir. 1995).

4        The elements of manufacturing a controlled substance are that the defendant (1)

5    knowingly or intentionally (2) manufactured methamphetamine.  *United States v. Basinger*, 60

6    F.3d 1400, 1406 (9th Cir. 1995).  Thus, with respect to the crime of manufacturing

7    methamphetamine, if a defendant builds a laboratory, assembles the necessary ingredients and

8    commences the manufacturing process but that process somehow is interrupted, there has been

9    an attempt.  *See Taylor*, 716 F.2d at 712, n. 6.

10       Here, Sevey testified that Marutz rented rooms at the Hangtown Motel.  It was from one

11   of those rooms that Lindholm seized the receipt that led the police to the storage locker.  It is

12   unnecessary to repeat the evidence from the storage locker that connected Marutz to the

13   manufacture of methamphetamine.  However, there is no question that the receipt connected

14   Marutz to the Hangtown Motel and to the essentially roving methamphetamine manufacturing

15   operation.  Again, the question is whether there is a reasonable probability of a different outcome

16   on this count if the evidence from the storage locker had been suppressed.  Clearly, there is not.

17       Marutz relies on the fact that the government had no physical evidence that a

18   methamphetamine laboratory existed in the Hangtown Motel.  Traverse, at 8.  The physical

19   evidence directly connecting Marutz to the Hangtown Motel fire and thus to the laboratory

20   Sevey and Bracamonte reported was the receipt and evidence from the storage locker.  As noted

21   above, however, the evidence from Bracamonte's truck connected Marutz to the manufacturing

22   equipment.

23       Furthermore, Sevey and Bracamonte established without question that Marutz was

24   involved.  Sevey assisted with the process at the Hangtown.  On Marutz's orders, Sevey

25   collected a package of pills that had been delivered to her home, purchased 15 gallons of

26   methanol at an automotive store and met Marutz at the Hangtown Motel.  Marutz paid for her

1   room.  The two of them opened the pills together.  Sevey, like Bracamonte with respect to what

2   occurred at the Brigadoon Lodge, testified that Marutz brought equipment from the motor home

3   into the motel room, including a kitchen garbage can, buckets and more methanol.  Marutz

4   stirred pills and methanol in buckets in the motel room kitchen.  In case there was any doubt

5   about whether ingredients and equipment were stored in the motor home, the Government

6   introduced electric heating elements, a crock pot, spatulas, knives, a small shovel, a small wood

7   bowl and small pots and pans with white powder on them, all of which had been seized from the

8   motor home.  Expert testimony established that these items all were the sorts of things that

9   would be used in the process of manufacturing methamphetamine.

10          The jury also heard that the Government agreed not to prosecute Sevey in exchange for

11   her assistance in this case.  Moreover, Sevey testified that she used cocaine or methamphetamine

12   every day she worked with Marutz; and, therefore, her recollection of the events might not be

13   completely accurate.  The jury was entitled to disbelieve Sevey.  Instead, after hearing and

14   seeing all of the evidence it chose to credit Sevey's testimony, which was sufficient to establish

15   that Marutz set up a laboratory at the Hangtown Motel, assembled the necessary equipment and

16   ingredients, and began the process of manufacturing methamphetamine.  The fire prevented

17   production of a completed product.  In light of this evidence, Marutz has failed to demonstrate

18   that if the evidence from the storage facility had been suppressed, there is a reasonable

19   probability of a different outcome on this count and the motion as to it fails.

20                          **4.  Possession of a Listed Chemical**

21          Turning to the charge of possession, the outcome again is the same.  In order to prove

22   that Marutz possessed a listed chemical, i.e., ephedrine, the government had to prove that Marutz

23   knowingly possessed ephedrine.  "[M]ere possession of a substantial quantity of [a controlled

24   substance] is sufficient evidence to support a finding that a defendant knowingly possessed the

25   [substance]."  *United States v. Collins*, 764 F.2d 647, 652 (9th Cir. 1985).  "Evidence that

26   contraband was present in an area over which the defendant had control is sufficient to support a

1   conviction for knowing possession even absent evidence that he acquiesced in the location of the

2   contraband.  *United States v. Mena*, 925 F.2d 354, 355 (9th Cir. 1991).  Evidence from the

3   storage locker was unnecessary to prove this charge.  The government relied heavily on

4   ephedrine seized from the motor home.  A government witness testified that officials found

5   ephedrine in the motor home.  Marutz conceded that the motor home was his.  Bracamonte and

6   Sevey both testified to Marutz driving it and removing equipment and chemicals from it.  Thus,

7   there was no question about whether Marutz had control over the vehicle in which the ephedrine

8   was found.  Marutz simply cannot prove *Strickland* prejudice on this count and the relief sought

9   must be denied.

10                    **5.  <u>Counsel's Failure to Preserve Evidence</u>**

11           As noted above, before trial the government lost or destroyed local law enforcement

12   officials' taped interview of Sevey and radio transmissions concerning Marutz's storage locker.

13   In particular, counsel asserted that the interviews with Sevey contained exculpatory evidence and

14   on that basis he moved to dismiss the indictment.  In his post-conviction motion, Marutz

15   contends that counsel's failure to ensure the preservation of these tapes prejudiced the outcome

16   of his trial.  Sec. Am. § 2255 Mot., at 8.  Marutz asserts that counsel's failure to request

17   disclosure of Sevey's statement allowed for its destruction, and that if counsel timely had

18   obtained it there is a reasonable probability that the outcome of trial would have been different.

19   With respect to the radio transmissions, Marutz claims that they would have supported his

20   argument that the evidence from the storage locker was the fruit of the poisonous tree and should

21   have been suppressed.  He also argued that Bracamonte's arrest was the fruit of the poisonous

22   tree in that, like the search, sheriff's deputies' surveillance of the storage locker was made

23   possible only by Lindholm's having seized the receipt at the Hangtown Motel.  As discussed

24   below, this claim, too, fails.

25   ////

26   ////

1

### a. Sevey Statement

2    As noted, Sevey gave a lengthy taped statement to officers of the Sparks Police

3 Department. Marutz conceded before the trial judge that Sevey's statement exculpated herself

4 and inculpated Marutz. With the present motion, Marutz has submitted a supplemental report

5 made by the detective who originally obtained Sevey's statement. In it, the officer described

6 what he recalled of the interview, which was not much. He stated that Sevey simultaneously

7 denied awareness of any wrongdoing on the part of Marutz and admitted to knowing that Marutz

8 was engaged in the manufacture of methamphetamine. Marutz has not submitted declarations or

9 other evidence suggesting that Sevey's statement would have tended to exculpate him. On a

10 post-conviction motion, it is the moving party's burden to allege particular facts in support of his

11 claim. *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not

12 supported by a statement of specific facts do not warrant habeas relief." ); *Boehme v. Maxwell*,

13 423 F.2d 1056, 1058 (9th Cir. 1970) (a petitioner's "conclusory statements are no substitute for

14 proper allegations of fact" supporting the ground for relief). Marutz has not submitted any

15 evidence that supports his claim. Thus, this claim fails.

16

### b. Taped Transmissions

17    For like reasons, the argument as to the deputies' radio transmissions also fails. First,

18 there is no merit to the claim that Marutz's trial counsel failed to take steps to acquire the

19 evidence. Indeed, counsel's written motion to dismiss the indictment for loss of that evidence

20 makes specific reference to the subpoenas that his investigator served on the El Dorado County

21 Sheriff's Office and the El Dorado County Communications Department "requesting copies of

22 the recording." Def.'s Mot. to Dism., filed October 19, 1993, at 2. The written motion notes that

23 the Sheriff's Office apparently never relayed a request of Bracamonte's counsel that the

24 recordings be preserved. *Id.* There is nothing in the record or presented by Marutz that

25 demonstrates counsel failed to take appropriate steps to acquire this evidence.

26 ////

1    Furthermore, Marutz has not shown prejudice from the loss of the recorded

2  transmissions.  He has not submitted any evidence of the content of these recorded

3  communications.  He makes no argument about how their content would have changed the

4  outcome of his motion to suppress evidence from the storage locker.  Neither has he made any

5  argument about how these transmissions would have resulted in the suppression of any of

6  Bracamonte's testimony.  In short, Marutz fails to demonstrate a reasonable probability that the

7  outcome of the trial on *any* count would have been different if counsel had obtained these

8  transmissions.  Marutz is not entitled to relief on this ground.

9    ### 6.  Counsel's Failure to Obtain Interview of Rita Heimbuch

10    Without argument or citation to any portion of the record or any documents submitted in

11  support of this claim, Marutz alleges that, "[c]ounsel also failed to obtain a recording of the

12  DEA's interview with Rita Heimbuch in January 1993, which would have provided exculpatory

13  evidence."  Sec. Am. § 2255 Mot., at 8.  In the absence of any evidentiary support or argument,

14  the court cannot give any meaningful consideration to this claim and the claim necessarily fails.

15    ### 7.  Counsel's Failure to Suppress Marutz's Confession to Officer Cowman

16    Marutz argues that counsel should have moved to suppress his statement[11] to Officer

17  Cowman that there were about 15 pounds of ephedrine in the motor home.  Sec. Am. § 2255

18  Mot., at 9.  Marutz does not in his motion specify which counts he challenges on this ground.

19  The court construes the argument as challenging the conviction of possession of a controlled

20  substance.  However, the analysis is the same as to all counts on which he was convicted.

21    Marutz must satisfy the *Kimmelman* standard discussed above.  To prevail, he must show

22  that his motion would have been meritorious and that there is a reasonable probability the verdict

23  would have been different had counsel presented the motion.  *See Ortiz-Sandoval v. Clarke*, 323

24

25    [11]  Marutz suggests in his unsigned document styled "affidavit" that he did not confess to
    Cowman and that he did not know until trial that testimony of a confession to Cowman would be
26  presented.  ER. 184.

1   F.3d 1165, 1170 (9th Cir. 2003) (no prejudice from counsel's failure to move to suppress

2   evidence).  Again, the court proceeds directly to the prejudice prong of *Strickland* because

3   regardless of whether counsel's performance was deficient, Marutz cannot prevail.

4         The court does not take lightly the impact and significance of the use of a confession at

5   trial.  A defendant's confession "is like no other evidence." *Arizona v. Fulminante*, 499 U.S. 279,

6   296 (1991).  It "is probably the most probative and damaging evidence that can be admitted

7   against him. . . . ."  For obvious reasons it has a "profound impact" on a jury.  *Id.* (internal

8   quotation marks and citations omitted.).  A full confession may easily tempt a jury to rely on that

9   evidence alone.  *Taylor v. Maddox*, 366 F.3d 992, 1017 (9th Cir. 2004).  Here, however, the

10  statement simply confirms the involvement by Marutz that is already firmly established by other

11  evidence.  The government presented the jury with items seized from the motor home, including

12  dark-colored plastic bags containing a total of about 30 pounds of a white powdery substance,

13  which they suspected was ephedrine.  Also in the motor home were two 15-gallon buckets full of

14  a methanol-white powder solution. There was no question that these items were consistent with

15  the possession of a controlled substance.  There was also no question that the motor home

16  belonged to Marutz.  There was testimony, however, that he was not the only person to drive it.

17  Nevertheless, the evidence clearly demonstrated that Marutz had control over the motor home

18  and its contents.  Sevey testified that she worked for Marutz and that he directed her involvement

19  in the project.  The jury, therefore, reasonably could have inferred that she drove the motor home

20  only with Marutz's permission.  Bracamonte and Sevey testified that at the Brigadoon Motel and

21  at the Hangtown Motel, Marutz took items from the motor home into the motel rooms.

22        In light of this evidence, Marutz having told law enforcement that ephedrine was in the

23  motor home cannot be said to have had a constitutionally significant impact on the outcome.

24  Significantly, Marutz's only argument about this prong of the analysis appears in his traverse:

25  "Failure to make the appropriate motion prejudiced Mr. Marutz, because suppression of the

26  Sparks evidence would have undermined the verdict."  Traverse, at 10.  To the contrary, the

1    court has explained why the jury would have reached the same verdict even without this

2    evidence.  Marutz has not met his burden on this claim.

3                8.  **Counsel's Failure to Suppress Evidence Seized Based on Coerced Consent**

4                Marutz alleges that his counsel should have moved to suppress evidence obtained in the

5    search of his motor home on the ground that law enforcement obtained his consent by coercion.

6    Sec. Am. § 2255 Mot., at 9.  Ordinarily, law enforcement officials must have a warrant in order

7    to search an area, such as a vehicle, in which a person has a reasonable expectation of privacy.

8    *See*, *e.g., California v. Acevedo*, 500 U.S. 565, 569 (1991).  However, authorities may conduct a

9    warrantless search if they obtain valid consent.  *Schneckloth v. Bustamonte*, 412 U.S. 218, 219

10   (1973).  To be valid, the consent must be voluntary considering the totality of the circumstances.

11   *Id.* at 227.  As with Marutz's other claims, he must not only show that there is merit to the

12   argument in favor of suppression, he must demonstrate a reasonable probability of a different

13   outcome if the evidence had been suppressed.  *Moore v. Czerniak*, 534 F.3d 1128, 1137-1138

14   (9th Cir. 2008).  Failure to make a meritless argument does not constitute ineffective assistance

15   of counsel.  *See United States v. Moore*, 921 F.2d 207, 210 (9th Cir. 1990); *Baumann v. United*

16   *States*, 692 F.2d 565, 572 (9th Cir. 1982) (counsel not ineffective by failing to move to dismiss

17   on grounds which could not have succeeded).

18              Here, the record shows that Marutz signed consent forms.  ER 74-76.  He argues that

19   authorities pressured him by abusing his wife.  Sec. Am. § 2255 Mot., at 9.  As evidence, he

20   submits a memorandum showing that the assistant federal public defender assigned to his case

21   believed that DEA agents were abusive towards Marutz and his wife at the time of Marutz's

22   arrest, and that this was the reason the magistrate judge in Reno released Marutz pending trial.

23   ER 17.  He also submits a document that he styled "affidavit," but which he never signed,

24   asserting that DEA agents abused him and his wife in order to obtain consent to search.  ER 178-

25   184.  Finally, he submits excerpts of the transcript from the initial appearance and subsequent

26   detention hearing before a magistrate judge in Nevada.  ER at 17-18.  Those excerpts show

allegations by defense counsel at the detention hearing that the defendant was "ill-used, his wife was roughed up, thrown around and handcuffed, and undoubtedly not charged with anything, as I understand it." ER 167. Marutz did not include any excerpts indicating that the magistrate judge made a finding that this occurred.[12] Nor does Marutz present actual evidence in support of the allegation. More to the point, he presents no evidence showing that whatever actually happened had any effect on his willingness at the time to consent to a search of the motor home. Marutz simply has not submitted any valid affidavits or other evidence detailing the circumstances he asserts amounted to coercion. Thus, he has not met his burden of demonstrating that counsel's failure to move to suppress the evidence from the motor home based upon this ground constituted deficient performance, or resulted in *Strickland* prejudice. Therefore, relief based on this claim must be denied.

### 9.  Counsel's Failure to Communicate with Marutz

Marutz alleges that counsel chronically failed to provide him with copies of discovery or communicate with him about the case. Sec. Am. § 2255 Mot., at 10. This omission, he asserts, impeded his ability to assist in his defense. Where counsel's failure to communicate constitutes deficient performance that undermines the outcome of trial, a movant is entitled to relief. *See*, *e.g.*, *United States v. Blaylock*, 20 F.3d 1458, 1465-66 (9th Cir. 1994) (counsel's failure to communicate a plea offer). But Marutz offers only his conclusions to support the claim. Such conclusory statements cannot substitute for proper allegations of fact. *James*, 24 F.3d at 26; *Boehme*, 423 F.2d at 1058.

Marutz fails to present evidence demonstrating either deficient performance or prejudice. He submits in support of his claim correspondence he sent to the trial judge complaining about counsel's failure to communicate with him. ER. 91-98. But Marutz makes no allegations

---

[12]  The magistrate judge noted at the initial appearance that DEA agents delayed hours after arresting Marutz before bringing him before the federal court, but did not make any finding of any rights having been violated or any particular misconduct. Nor is there any indication that consent to a search had been coerced.

concerning the identity or testimony of witnesses, or any other information or evidence he could have provided to counsel if counsel had communicated with him.  Nor does he demonstrate any probability that any such information or evidence would have affected the verdict.  The record only shows that counsel did not communicate with Marutz as much as Marutz wished.  The amount of communication between counsel and client is not a fixed quantity in each case. Moreover, Marutz has not submitted any evidence that he requested a meeting with counsel in order to provide him with useful information, or that he sent counsel useful information and counsel failed to follow up on it.

Marutz's conclusory allegations are insufficient for the court to find deficient performance and this claim must also fail.

**B.  Ineffective Assistance of Counsel (Trial)**

Marutz alleges five distinct instances in which he asserts that trial counsel was ineffective during trial.  As to each he has failed to demonstrate that he is entitled to relief.

**1.  <u>Failure to Present Lab Report which Contradicted Co-Conspirator Testimony</u>**

Marutz alleges that counsel failed to present evidence that Sevey and Bracamonte lied to DEA agents.  He asserts that counsel should have impeached both Sevey and Bracamonte with evidence that the substances found at the Brigadoon Lodge did not test positive for controlled substances.  Sec. Am. § 2255 Mot., at 10.  Marutz argues that this impeachment would have made a difference to the outcome because Bracamonte and Sevey testified that there had been a drug lab "accident" at the Brigadoon Lodge.  Sec. Am. § 2255 Mot., at 10.  Again, the court need not determine whether this "omission" constituted deficient performance because Marutz simply cannot demonstrate prejudice.  Both Sevey and Bracamonte testified that Marutz was personally involved in the details of manufacturing methamphetamine at several locations, including the Brigadoon Lodge.  It was at this location that there was a small explosion, on the heels of which Sevey became involved in the operation.  Marutz testified that Bracamonte dropped a glue gun

1    and that in any event, he himself was not even present.  In Martuz's version of events,

2    Bracamonte ultimately admitted that he was manufacturing methamphetamine and identified the

3    powder in the bathtub as ephedrine.

4           It is against this background that Marutz now relies on the fact that the government's lab

5    results showed that the substances collected from the Brigadoon Lodge were not ephedrine or

6    methamphetamine but rather had a chemical makeup consistent with flour or starch.  ER 54.

7    Against a different background, that information might have at least been useful in cross

8    examination.  But the fact remains that at trial, Marutz did not challenge the nature of the

9    substances found.  Instead, he admitted that Bracamonte told him that the bathtub contained

10   ephedrine.  With respect to the Brigadoon Lodge explosion, Marutz testified that he was not

11   present at the time of the explosion; that initially Bracamonte explained that a glue gun had burnt

12   the carpet; but that when Marutz arrived at the motel room, Bracamonte admitted to

13   manufacturing methamphetamine.  Thus, that the government's testing did not corroborate

14   Sevey's and Bracamonte's testimony would not have helped his defense. The testing did not

15   corroborate Marutz's testimony, either.  Furthermore, the jury was entitled to disbelieve

16   defendant's testimony and to consider whatever it deemed to be falsehoods as affirmative

17   evidence of guilt.  *See Wright v. West*, 505 U.S. 277, 295 (1992).   In light of all the evidence

18   presented, the jury decided to credit the government's version of events over that of Marutz.

19              **2.  Failure to Use Witness Rita Heimbuch's Exculpatory Testimony**

20          Marutz next asserts that counsel should have called Rita Heimbuch to contradict

21   testimony offered by Sevey.  Sec. Am. Mot. at 1.  He asserts that Ms. Heimbuch would have

22   testified that when she and Marutz initially met Sevey, they did not discuss ephedrine extraction

23   or the manufacture of methamphetamine.

24          Whether and how to examine or cross-examine a witness are classic examples of strategic

25   decisions counsel must make countless times in the course of a trial as complicated as that of

26   Marutz.  Counsel "has a duty to bring to bear such skill and knowledge as will render the trial a

reliable adversarial testing process." *Strickland*, 466 U.S. at 688.  "It is all too tempting for a

defendant to second-guess counsel's assistance after conviction . . . ."  *Id.*  Thus, courts will

"indulge a strong presumption that counsel's conduct falls within the wide range of reasonable

professional assistance; that is, the defendant must overcome the presumption that, under the

circumstances, the challenged action might be considered sound trial strategy."  *Id.*  Thus,

Marutz cannot prevail on this claim solely because in hindsight, it may appear that counsel could

have raised a question about whether Sevey was honest about or correctly recalled her initial

conversations with Heimbuch.  The record shows that counsel had a reasonable strategic reason

for deciding not to call her, i.e., concern over her cross-examination about whether she lied to

police to protect Marutz at the time of their arrest on his failure to appear.[13]  Moreover, Marutz

makes no showing that the outcome of trial might have been different if Heimbuch had been

impeached on the single question of her early conversations with Sevey.  Thus, her credibility

would have been doubtful to say the least.  The government presented a wealth of evidence that

Marutz, Sevey and Bracamonte together worked to manufacture methamphetamine.  Whether

Sevey was absolutely forthright about her initial conversations with Heimbuch cannot be said to

have had a significant effect on the outcome.

////

---

[13]  Convened outside the presence of the jury, the court heard from Ms. Heimbuch's counsel on whether she would assert her Fifth Amendment rights.  Her counsel stated she would if asked about certain topics, RT 916, and the court pressed the prosecutor to reveal her intended questions for cross-examination.  RT 926-30.  The prosecutor noted that the witness, Heimbuch, was sexually involved with the defendant and still had a personal relationship with him, that she was in communication with him when and after he absconded and that she initially lied to protect him.  RT 926.  The prosecutor noted that when Heimbuch and Marutz were apprehended following the failure to appear, Heimbuch told police officers in Oregon that all she knew of him was his first name and then filed a false police report stating that she was kidnaped by him at gunpoint.  RT 919.  The court ruled that the government would be permitted to ask Heimbuch on cross whether the defendant called her after he failed to appear in court and to ask about any statements the defendant made to her regarding his failure to appear.  RT 929-30.  After Marutz's trial counsel heard a full recitation of each of the questions the prosecutor would be allowed to ask Heimbuch on cross, counsel wisely stated "I'm going to withdraw her as a witness."  RT 931.

1       As Ms. Heimbuch's purported testimony may have been harmful to Marutz's defense by

2  opening the door to potentially damaging cross-examination, counsel's decision not to call Ms.

3  Heimbuch as a witness was reasonable under the circumstances.  Therefore, the claim of

4  ineffective assistance of counsel arising from defense counsel's failure to use Ms. Heimbuch's

5  testimony must be denied.

6       **3.  <u>Failure to Contact Witnesses or Complete Investigation</u>**

7  Marutz makes the following contention:

8        Counsel failed to contact potential defense witnesses whose names had
    been provided by Mr. Marutz.  The defense investigator, Thomas Rowe, never

9    traveled to Oregon to interview witnesses, although funding to do so had been
    secured.  Counsel took no action when he witnessed Mr. Rowe's on-the-job

10  inebriation, a likely contributor to the incomplete investigation.  The investigator
    appeared "drunk" to two defense witnesses contacted by telephone.  At trial,

11  counsel called only one defense witness, and failed to utilize Rita Heimbuch (who
    was subpoenaed by the government) to counter the testimony of Linda Sevey.

12

13  Sec. Am. § 2255 Mot., at 10-11.  Respondent does not address Marutz's particular assertions.

14  Instead, he contends in general that Marutz cannot prove deficient performance.  Resp.'s Opp'n,

15  at 14-16.  Federal courts operate under a "strong presumption that counsel's conduct falls within

16  the wide range of reasonable professional assistance," and therefore "[j]udicial scrutiny of

17  counsel's performance must be highly deferential . . . ."  *Strickland*, 466 U.S. at 689.  Counsel,

18  however, "has a duty to make reasonable investigations or to make a reasonable decision that

19  makes particular investigations unnecessary."  *Id.* at 691.  Therefore, counsel is ineffective

20  where he fails to conduct a reasonable investigation and there is no showing of a reasonable

21  strategic basis for this omission.  *See Hendricks v. Vaszquez*, 974 F.2d 1099, 1109 (9th Cir.

22  1992).  Certainly the failure to interview or to attempt to interview important witnesses can

23  constitute deficient performance.  *See Reynoso v. Giurbino*, 462 F.3d 1099, 1112 (9th Cir. 2006);

24  *United States v. Tucker*, 716 F.2d 576, 583 (9th Cir. 1983).  However, Marutz has the burden of

25  demonstrating that counsel's performance was "so deficient that it fell below an objective

26  standard of reasonableness."  *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002).

1  Furthermore, "ineffective assistance claims based on a duty to investigate must be considered in

2  light of the strength of the government's case." *Eggleston v. United States*, 798 F.2d 374, 376

3  (9th Cir. 1986).

4          Here, It is apparent from the evidence recounted above that the Government presented a

5  strong case that Marutz was not only heavily involved in the manufacture of methamphetamine,

6  he led the endeavor.  Marutz offers no details of when counsel allegedly observed Mr. Rowe

7  intoxicated.  He offers no declarations or other evidence to substantiate his assertions that

8  counsel actually made this observation.  Indeed, he does not even identify the witnesses who

9  reported that the investigator was intoxicated or allege that the presence of either witness was

10  compromised because Mr. Rowe was intoxicated.  Marutz does not identify the witnesses

11  counsel failed to locate, what these individuals would have said or how any of them would have

12  provided beneficial information.  Thus, there is no way of determining whether counsel actually

13  failed to investigate.  This claim lacks any evidentiary support as to either prong under

14  *Strickland* and must fail.

15                    **4.  Failure to Exclude Marutz's Confession to Captain Cowman**

16          Marutz contends that trial counsel should have moved to exclude Cowman's testimony

17  concerning Marutz's statements. Sec. Am. § 2255 Mot., at 9.  Cowman testified that Marutz

18  admitted to transporting for a friend ephedrine for the purpose of manufacturing

19  methamphetamine.  RT 760.  Marutz now asserts that he made no such statement, and that

20  counsel's performance was deficient because he did not show Marutz the discovery the

21  prosecution intended to rely on to prove the alleged admission.  Marutz claims that the

22  prosecution's use of this admission prejudiced his case.

23          As noted above, however, Marutz cannot demonstrate prejudice from this admission.  In

24  light of all other evidence introduced against him at trial demonstrating his involvement, Marutz

25  has not shown a reasonable probability of a different outcome if Cowman's testimony as to the

26  statements had been excluded.  *Moore v. Czerniak*, 534 F.3d at 1137-1138 .

1  **5. <u>Failure to Move for Acquittal</u>**

2      Marutz asserts that trial counsel should have moved for judgment of acquittal upon the

3  ground that the evidence was insufficient to prove that defendant possessed ephedrine within the

4  Eastern District of California.  Sec. Am. § 2255 Mot., at 11.  In a prosecution of multiple

5  offenses, venue must be proper with respect to each count.  *United States v. Corona*, 34 F.3d

6  876, 879 (1994).  It appears that Marutz challenges venue with respect to the charge of

7  possession of a controlled substance.

8       Proper venue is a Constitutional requirement.  The trial of a crime "shall be held in the

9  State where the said Crime[] shall have been committed."  U.S. CONST., art. III, § 2.

10  Furthermore, the trial shall occur in the "district wherein the crime shall have been committed,

11  which district shall have been previously ascertained by law."  U.S. CONST. amend. VI.  Thus,

12  the rules governing federal prosecutions states that unless otherwise provided by statute or rule,

13  "the government must prosecute an offense in a district where the offense was committed."  Fed.

14  R. Crim. P. 18.  Despite its constitutional stature, venue is not an essential element of a crime.

15  *United States v. Powell*, 498 F.2d 890, 891 (9th Cir. 1974).  Therefore, facts establishing venue

16  must be proven only by a preponderance of the evidence and proof of venue may be wholly

17  circumstantial.  *United States v. Jones*, 231 F.3d 508, 516 (9th Cir. 2000); *Powell*, 498 F.2d at

18  891. "When a given offense is continuing, venue can properly be had in the district where it was

19  commenced, continued or was completed."  *United States v. Valdez-Santos*, 457 F.3d 1044, 1046

20  (9th Cir. 2006); 18 U.S.C. § 3237.  Possession is a continuing crime.  *Valdez-Santos*, 457 F.3d at

21  1046.  Placerville is in El Dorado County, which is within the Eastern District of California.  28

22  U.S.C. § 84(b).  Thus, with respect to the possession charge, venue was proper as long as Marutz

23  did some act either to commence, continue or complete the offense in El Dorado County.

24      Marutz contends that counsel should have moved for judgment of acquittal under Rule

25  29(a) of the Federal Rules of Criminal Procedure.  Sec. Am. § 2255 Mot., at 11.  He seems to

26  argue that the jury was confused about venue, asserting that the jury asked a question about it.  In

40

1    the formal jury charge, the court instructed the jury that in order to find Marutz guilty of

2    possession of a controlled substance, they had to find that he possessed ephedrine in El Dorado

3    County.

4            During deliberations, the jury requested guidance with respect to this instruction.  In

5    response, the court clarified that the jury must find that Marutz possessed ephedrine in El Dorado

6    County and that while in that county, Marutz had reasonable cause to believe that it would be

7    used in the manufacture of methamphetamine.  Marutz does not explain the significance of the

8    jury's question or the court's response to it in relation to this claim.  There is no evidence that

9    the jury did not know which motel was located in El Dorado County.

10           Marutz also seems to argue that the evidence was insufficient to prove that he possessed

11   a controlled substance in El Dorado County.  In support of his position, he asserts that there was

12   no physical evidence that the white powdery substance found in the motel in Placerville was

13   ephedrine and he asserts that there was a break in the chain of custody for that evidence.  Marutz

14   correctly asserts that the Placerville Police Department report about the powdery substance

15   found in the containers at the Hangtown was identified as flour or starch.  ER 22.  The liquid was

16   identified as alcohol or methanol.  *Id*.  However, another exhibit Marutz has submitted shows

17   that Sgt. J. Weaver tested the white wet substance from one of the large plastic buckets from that

18   location, and the substance tested positive for ephedrine.  ER 38.  Marutz argues that the chain of

19   custody with respect to this substance was broken and therefore the jury could not rely on it to

20   find that Marutz possessed ephedrine in El Dorado County.  He submits evidence that the

21   document on which the custody of the four Hangtown samples were recorded has an amendment.

22   ER 36. The third entry says that the sample was relinquished by "J. Weaver," which is crossed

23   out in favor of "Lindholm."  ER 36.  Other than showing the correction of the name to reflect

24   which officer is being referred to, the cross out and entry of the other officer does not materially

25   alter the outcome.  It is not indicative of some sort of tampering with the evidence and  Marutz

26   has not submitted any affidavits or other evidence that so much as suggests that the samples were

1  mishandled.  Thus, the court cannot conclude that the evidence was tainted or mishandled such

2  that counsel could have obtained a judgment of acquittal on the ground that Marutz did not

3  possess and had no connection to ephedrine in El Dorado County.

4      **C.  Ineffective Assistance of Counsel (Sentencing)**

5      Marutz alleges that trial counsel rendered ineffective assistance in sentencing.   For the

6  reasons stated below, the court finds that Marutz fails to demonstrate prejudice.

7          **1.  Failure to Retain Independent Expert to Challenge Drug Quantity**

8      Marutz contends that counsel should have retained an independent expert to challenge the

9  government's estimations of drug quantity.  Sec. Am. § 2255 Mot., at 12.  The entirety of

10  Marutz's claim is the following: "Counsel failed to retain an independent expert to challenge the

11  government's estimations of drug quantity." *Id*.  Respondent asserts that Marutz cannot prove

12  deficient performance.  Answer, at 17.  Marutz does not allege what an expert could have

13  determined or how this could have affected his sentence.  Again, Marutz's conclusory statements

14  cannot substitute for evidence or for proper allegations of fact supporting the ground for relief.

15  *James v. Borg*, 24 F.3d at 26; *Boehme v. Maxwell*, 423 F.2d at 1058.  There is no factual basis

16  for the court to grant relief on this claim.

17          **2.  Failure to Challenge Drug Calculation Errors in the Pre-Sentence Report**

18      Marutz alleges that there were factual errors in the pre-sentence report and that his

19  counsel's failure to correct them was prejudicial.  Sec. Am. § 2255 Mot., at 12.   He claims that

20  the report contained errors with respect to the quantity of pills that were used to extract

21  ephedrine, the estimated amount of methamphetamine that could be produced from the pills

22  found in Marutz's motor home, and the calculation of how much methamphetamine could have

23  been produced based on the evidence seized from Bracamonte's apartment.  *Id*.  Respondent

24  again merely asserts that Marutz cannot prove deficient performance.  Answer, at 17.  Marutz

25  does not explain or submit any evidence suggesting how the Government's calculations were

26  wrong.  Neither does he propose how the calculations could have been done differently.  Thus,

1  there is no basis for finding that either counsel's performance was deficient or that Marutz was

2  prejudiced thereby and this claim fails.

3  ### 3.  **Failure to Move for Downward Departure at Sentencing**

4         Marutz asserts counsel should have moved for a downward departure based on his age

5  and on the fact that his wife was disabled and wholly dependent upon him to provide for her

6  daily necessities.  Sec. Am. § 2255 Mot., at 12.  To prove ineffective assistance at sentencing,

7  Marutz must allege and demonstrate particular instances of deficient performance, and he must

8  demonstrate that in the absence of these deficiencies, there is a reasonable probability of a

9  different outcome of the sentencing proceeding.  *Strickland*, 466 U.S. at 693-94.

10        Crucial to this claim is the law governing sentencing in effect at the time of Marutz's

11  crime.  At that time, a trial judge was required to impose a sentence that was within a certain

12  range under the sentencing guidelines unless it determined that there were valid grounds for

13  departing from that range.  18 U.S.C. § 3553(b).  For a circumstance to qualify as a valid ground

14  for departing from the prescribed guideline range it must have been related to a penological

15  purpose or legitimate sentencing concern expressed in the Sentencing Reform Act.  *United States*

16  *v. Crippen*, 961 F.2d 882, 884 (9th Cir. 1992).  The defendant's age could be such a

17  circumstance "when the offender is elderly and infirm and where a form of punishment . . . might

18  be equally efficient as and less costly than incarceration."  *United States v. Anders*, 956 F.2d

19  907, 912 (9th Cir. 1992) (mere fact that the defendant was 46 years of age at the time of the

20  offense does not bring him within this basis for a downward departure).  Marutz relies on the

21  trial judge's concern that the presumptive sentence in this case was harsh.  ER 269-277.  If

22  Marutz's wife had a disability necessitating assistance with daily activities, Marutz had the

23  burden of demonstrating that this was an "extraordinary circumstance," *United States v.*

24  *Mondello*, 927 F.2d 1463, 1468-70 (9th Cir. 1991), i.e., it was out of the ordinary, remarkable,

25  ////

26  ////

1   uncommon or rare, *Anders*, 956 F.2d at 912.  Marutz has not submitted any evidence[14] that his

2   situation was out of the ordinary or rare.  In fact, before he was convicted, he did not hesitate to

3   hire other people and rely on friends to care for his wife.  He offers no explanation of why this

4   would be any different after his conviction.  Given the lack of any evidence on this point, this

5   claim must fail.  *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) (unsupported conclusory

6   allegations not adequate).

7       Furthermore, Marutz is unable to demonstrate prejudice.  The pre-sentence report

8   recommended a calculated offense level of 46.  At the sentencing hearing the district judge

9   lowered the offense level to 42.  Judgment and Commitment, filed December 12, 1994.  On

10  appeal, the Ninth Circuit vacated Marutz's sentence and remanded to allow Marutz to exercise

11  his right of allocution.  After Marutz presented his arguments, including the facts that he was a

12  first time offender and had an invalid wife, the judge found that in light of all of the facts the

13  guidelines still mandated Marutz's original sentence.  Re-Sentencing RT, 22, 30.  Thus, he

14  presented the information and it made no difference to the outcome of his sentence.

15      Marutz has failed to demonstrate that he is entitled to relief on this claim.

16  **D.  Ineffective Assistance of Counsel (Appellate)**

17      Marutz alleges six distinct instances in which, he claims, his appellate counsel was

18  ineffective.  For the reasons explained below, the court finds that none of these claims has merit.

19  ////

20  ////

21  ////

22  ////

23

24      [14] Marutz's unsigned documents purporting to be affidavits describe his wife, B.J., as an
    "invalid" who had suffered aneurism, resulting in a "frontal lobial [sic] condition."  ER at 181.
25  At trial, Marutz testified that as a result of an aneurism, she has a limited attention span and
    ability to plan ahead.  RT 1069.  Thus, he asserted, she cannot be left alone for more than a few
26  hours.  *See id.*

1    **1.  Failure to Challenge Application of "Plain View" to Queens Storage**
2        **Receipt**

3        Marutz asserts that in his first appeal, appellate counsel failed to argue that the trial court

4    misapplied the plain view doctrine.  Sec. Am. § 2255 Mot., at 12.   Once again, the applicable

5    standards are those set out in Strickland.  *See Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir.

6    1989).  Thus, in order to prevail, a movant must demonstrate that appellate counsel's

7    performance fell below an objective standard of reasonableness and that there is a reasonable

8    probability that, but for counsel's unprofessional errors, he would have prevailed on appeal.  *See*

9    *Miller*, 882 F.2d at 1434, & n. 9.  In evaluating the claim that counsel was ineffective by failing

10   to raise a particular claim on appeal, the court is mindful that appellate counsel is not

11   constitutionally obliged to raise every non-frivolous issue that the defendant wishes to have

12   presented.  *Jones v. Barnes*, 463 U.S. 745, 754 (1983); *Miller*, 882 F.2d at 1434

13       Marutz argues that because the appellate court relied on the plain view doctrine in

14   finding the seizure of the storage locker receipt constitutional, appellate counsel's failure to raise

15   the issue on direct appeal was an unreasonable omission.  The assertion is a non-sequitur.  As

16   discussed above, the evidence in the record simply does not support the factual predicate for

17   Marutz' challenge to the district judge's finding that the receipt was in plain view.  Judge Garcia

18   held an evidentiary hearing on the suppression motion, heard the testimony of the officer, and

19   found that while the officer was in the motel room looking for hazardous chemicals "he saw *in*

20   *plain sight* on a night stand a rental receipt for a storage locker."  ER 144.  The testimony of the

21   officer, which was credited by the judge who saw and heard the witness, clearly supports that

22   finding and the record contains no evidence to undermine it.  Neither has Marutz submitted any

23   such evidence on this motion.

24       Finally, although Marutz has not demonstrated that counsel's performance was deficient,

25   neither has he demonstrated prejudice, i.e., a reasonable probability that the outcome of the

26   appeal would have been different had the issue been raised on appeal.  Thus, Marutz is not

entitled to relief on this claim.

### 2. Failure to Challenge the Denial of Evidentiary Hearing on Destruction of Evidence

Marutz next raises the fact that Sevey's statement to officers of the Sparks Police Department was destroyed, as was a recording of communication between law enforcement officers conducting surveillance near Marutz's storage locker. Marutz asserts appellate counsel should have challenged the district court's denial of an evidentiary hearing on the motion to dismiss for destruction of evidence. Sec. Am. § 2255 Mot., at 14. He asserts that if the trial court had held a hearing, he could have established that the evidence was destroyed in bad faith and that the evidence was exculpatory. Sec. Am. § 2255 Mot., at 14. The court has already explained that Marutz failed to demonstrate that trial counsel was ineffective with respect to this matter. Marutz offers no substantive argument to demonstrate that if counsel had raised this issue, there is a reasonable probability that he would have prevailed on appeal. There is no basis for granting relief on this claim.

### 3. Failure to Challenge Sentence and Various Enhancements

Marutz asserts appellate counsel should have challenged the sentence on the following grounds: (1) improper calculation of drug quantities relevant to base offense level; (2) erroneous role enhancement; (3) erroneous weapons possession enhancement; (4) erroneous obstruction of justice for failure to appear enhancement; and (5) erroneous imposition of restitution. Counsel raised these issues in Marutz's second appeal, but the Ninth Circuit rejected them all on the ground that the only issue on remand was allocation, which had been satisfied. Ninth Circuit Judgment, filed March 10, 1998, at 1. Once again, Marutz does not offer any specific facts or legal argument in support of this claim for relief and it necessarily fails.

### 4. Improper Presentation of Marutz's Allocution Issue

Marutz argues that his appellate counsel's presentation of the allocution issue on appeal limited Marutz's eventual exercise of the right. Sec. Am. § 2255 Mot., at 14. The argument is

46

not easily discerned.  On his first appeal, counsel argued that Marutz was pressing the right of

allocution in order to convince the court to rethink and reassess Marutz's role in the conspiracy.

The Ninth Circuit's order vacating the sentence remanded the matter "solely to allow Marutz to

exercise his right of allocution."  Ninth Circuit Judgment, filed January 30, 1996, at 5.  Yet, on

remand, the trial court expressly *declined to limit* the exercise of Marutz's allocution, and

permitted him to address all of his individual challenges to the length of his sentence.  Therefore,

counsel's presentation of Marutz's allocution issue had no limiting effect on Marutz's ability to

present his claims, and Marutz has failed to demonstrate prejudice.  Nor has he demonstrated any

merit to the underlying claim.  Marutz is not entitled to relief based on this issue.

### 5.  Failure to Advise Marutz to Request Downward Departure

In a related claim, Marutz asserts that the attorney representing him in the re-sentencing

failed to advise Marutz that he could request a downward departure.  Thus, Marutz argues, he

made no such request and instead addressed only his enhancements during allocution.  In the

course of the hearing Marutz asserted that he was a first time offender, and that his wife was

disabled and dependent upon him.  However, the trial judge discussed Marutz's right to request a

downward departure at least six times.  A seventh discussion would have made no difference.

Marutz does not now submit any evidence that would have entitled him to a lesser sentence.

Since Marutz had the opportunity to present arguments in favor of a downward departure and he

does not submit any evidence that could have convinced the judge to enter a downward

departure, he cannot demonstrate any prejudice from counsel's alleged omission.  This claim

must be denied.

### 6.  Alleged Failure to Communicate with Marutz Regarding the Case

Marutz asserts that his counsel failed to communicate with him about his appeal and

failed to provide advance drafts of the briefs for review.  Sec. Am. § 2255 Mot., at 15.  Again,

Marutz does not allege any facts based upon which the court could find prejudice or even

evaluate the claim.  Thus, this claim necessarily fails.

1        **E.  Alleged Due Process Violations at Sentencing (Drug Quantity Finding)**

2            Marutz claims that the judge sentenced him based in part on facts not submitted to the

3    jury to be proved beyond a reasonable doubt.  Sec. Am. § 2255 Mot., at 15.  Relying on

4    *Apprendi v. New Jersey*, 530 U.S. 466 (2000), Marutz argues that the quantity of controlled

5    substances should have been submitted to the jury for determination.  In *Apprendi*, the United

6    States Supreme Court held that the constitutional guarantees of due process and jury trial require

7    that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime

8    beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a

9    reasonable doubt." *Apprendi*, 530 U.S., at 490.  Before *Apprendi*, the government had to prove

10   quantity only by a preponderance of the evidence.  *See United States v. Buckland*, 289 F.3d 558,

11   567 (9th Cir. 2002).  Respondent counters that *Apprendi* is not retroactive.  As discussed below,

12   it is not retroactive to this claim.

13           Marutz was convicted and sentenced under the authority of 21 U.S.C. § 841(a)(1), which

14   provides that "it shall be unlawful for any person knowingly or intentionally . . . to manufacture,

15   distribute, or dispense, or possess with intent to manufacture, distribute or dispense a controlled

16   substance . . . ."  The penalty depends upon the type and amount of the controlled substance

17   involved in the offense.  Thus, where the substance is methamphetamine and the amount is

18   unspecified, the penalty is imprisonment "for not more than 20 years," 21 U.S.C. § 841(b)(1)(C).

19   *See United States v. Durham*, 941 F.2d 886, 889 (9th Cir. 1991).  Evidence of the amount of

20   controlled substances involved in the offenses for which Marutz was convicted was presented to

21   the trial judge, who found the amount to have been proved by a preponderance of the evidence.

22           The Ninth Circuit has left no doubt that *Apprendi* applies to 21 U.S.C. § 841(a) and (b).

23   *Buckland*, 289 F.3d at 568.  Thus, in a prosecution under § 841, drug quantity and type "must be

24   charged in the indictment, submitted to the jury, subject to the rules of evidence, and proved

25   beyond a reasonable doubt." *Buckland*, 289 F.3d at 568.  The indictment, presentation of

26   evidence and burden of proof in this case did not satisfy this standard.  However, Marutz cannot

48

1   prevail on this claim because the rule of *Apprendi* and applied in *Buckaland* is not retroactively

2   applied.  Under the principle of non-retroactivity, except for two narrow categories of cases, any

3   new rule of constitutional criminal procedure announced by the United States Supreme Court is

4   not applicable to cases that are final at the time the rule is announced.  *Teague v. Lane*, 489 U.S.

5   288, 310 (1989).  Marutz's conviction became final on direct review in 1996, before the

6   Supreme Court decided *Apprendi* in 2000.  In 2002, the Ninth Circuit held that *Teague* bars the

7   application of *Apprendi* to cases that were final on direct review when the case was decided.  *See*

8   *United States v. Sanchez-Cervantes*, 282 F.3d 664, 671 (9th Cir. 2002).  Thus, this claim must be

9   denied.

10   **F.  Alleged Due Process Violations at Sentencing (Deadly Weapon Finding)**

11          Marutz' similar argument that the issues concerning sentencing guideline calculation and

12   whether there were grounds for departure is essentially identical to the previous one, except that

13   Marutz relies on additional facts and case precedent more recent than *Apprendi*.  Sec. Am.

14   § 2255 Mot., at 18; Supp. P. & A. of March 14, 2005, at 2.  It fails for the same reasons.

15          Thus, Marutz argues that the trial judge should have let the jury determine whether

16   Marutz possessed a deadly weapon, whether he had a leadership role and whether he obstructed

17   justice.  Sec. Am. § 2255 Mot., at 18.  In 2004, the United States Supreme Court, examining a

18   state sentencing scheme that was nearly indistinguishable from the federal Sentencing

19   Guidelines, invalidated a sentence on the ground that for purposes of an *Apprendi* analysis, the

20   "statutory maximum" is the greatest sentence that the judge may impose based only on the facts

21   reflected in the jury verdict or admitted by the defendant.  *Blakely v. Washington*, 542 U.S. 296,

22   303 (2004).  In 2005, the United States Supreme Court held that the rule announced in *Blakely*

23   applies to the federal Sentencing Guidelines.  *United States v. Booker*, 543 U.S. 220, 244

24   (2005).  The Ninth Circuit has held that *Booker* does not apply retroactively in § 2255

25   proceedings where the conviction was already final when *Booker* was final.  *United States v.*

26   *Cruz*, 423 F.3d 1119 (9th Cir. 2005) (*per curiam*).  As noted, Marutz's conviction was final in

1996.  Thus, the court cannot apply the 2005 decision in *Booker* to his case and this claim must fail.

**III.  Conclusion**

Marutz has not demonstrated that the judgment was unlawful.  Thus, the motion to vacate must be denied.

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1.  Marutz's November 30, 2004, Second Amended Motion to Vacate, Set Aside, or Correct a Sentence pursuant to 28 U.S.C. § 2255 be denied; and

2.  The Clerk of the Court be directed to close companion civil case No. CIV. S-99-1305 LKK EFB.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

DATED:  February 3, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE